35897. STATE OF GEORGIA *et al. v.* COCA-COLA BOTTLING CO.

610

DECIDED FEBRUARY 23, 1956—REHEARING DENIED MARCH 15, 1956.

*Eugene Cook, Attorney-General, Ben F. Johnson, Jr., H. Grady Almand, Jr., William L. Norton, Jr., Assistant Attorneys-General, Broadus B. Zellars, Deputy Assistant Attorney-General,* for plaintiff in error.

*Edward R. Kane, Jones, Williams, Dorsey & Kane,* contra.

614

FELTON, C. J. ■ The general demurrer to the petition was properly overruled. The questions involved on the issues raised by the demurrer and the exception to the final judgment are so similar and overlap to such a great extent that we are going to confine our discussion to the questions raised by the exceptions to the final judgment. The contracts involved are quite lengthy, and we think to state generally what the provisions are and the material evidence will suffice without unduly encumbering the record. Petitioner is and was during the tax years in question, a wholly owned subsidiary of The Coca-Cola Company. The Coca-Cola Company is, and has been since 1892, the sole owner throughout the world of the secret formula, trade names, trademarks, copyrights, patents, and good will associated and connected with the product sold to the public as Coca-Cola, and also the sole manufacturer of Coca-Cola syrup which is used in making this product. The relationship between The Coca-Cola Company and Coca-Cola Bottling Company began in 1899. Until that year the syrup had been used only as the base for a drink served at soda fountains for immediate consumption. In 1898 a contract was entered into between The Coca-Cola Company and petitioner's assignors. In this contract The Coca-Cola Company granted to petitioners through its assignors: (1) The sole and exclusive right to bottle and sell Coca-Cola and to use the Coca-Cola trade names, trademarks, copyrights, and designs in association with bottled Coca-Cola within a territory consisting of most of the United States; and (2) the right to obtain from The Coca-Cola Company all the Coca-Cola syrup necessary for serving this territory at a specified price per gallon. Petitioner obligated itself to establish bottling plants and promote the sale of bottled Coca-Cola in this territory and to secure all the Coca-Cola syrup necessary for serving this territory from The Coca-Cola Company at the specified price per gallon. In the years that have followed petitioner has discharged its obligation to establish bottling plants and promote the sale of bottled Coca-Cola in its territory by granting to other individuals and corporations the same rights which it had acquired, except that the sub-contracts were always with respect to smaller territories within the over-all territory of petitioner, and the price per gallon of syrup agreed on in the sub-contracts was higher than that established in the contract between The Coca-Cola Company and petitioner. In

some instances the sub-contractors granted similar contracts to other individuals and corporations within still smaller territories at a higher price per gallon of syrup. During the tax years in question The Coca-Cola Company was the sole manufacturer of Coca-Cola syrup with its manufacturing plant in Georgia. First-line bottlers and sub-bottlers were located within and without the State of Georgia. These bottlers placed monthly orders for their syrup needs with petitioner at its principal office in Atlanta, and petitioner in turn forwarded identical orders on to The Coca-Cola Company, also at its principal office in Atlanta, which in turn shipped orders directly from its manufacturing plant in Georgia to the bottlers located within and without Georgia. . Petitioner had nothing to do with the shipping of the syrup, and all shipments were made on a "delivered at destination" basis pursuant to the contracts between all the parties. During the tax years in question petitioner was not engaged in any manufacturing or bottling operations and at no time obtained or held any physical possession or inventory of Coca-Cola syrup for any purpose.

■ The first question to be decided is, whether petitioner was engaged in the business of selling Coca-Cola syrup. In the absence of any evidence of subterfuge or fraud, the conclusion is demanded that the petitioner was so engaged. The bottlers ordered their syrup from petitioner and were obligated to pay petitioner, and petitioner only, for the syrup ordered. Petitioner and petitioner alone was liable for breaches of its undertaking to see that the syrup ordered was delivered. Under the plain terms of the contracts, there was no agency or mere royalties involved. The fact that the contracts contained numerous other provisions would not operate to affect the selling provisions, nor would the fact that The Coca-Cola Company shipped the syrup directly from its plant to the various bottlers. The corporations are separate and distinct entities, authorized by law, and there is nothing shown in the way of evidence or legal authority why they may not operate legally and ethically as they undertook to do. The fact that petitioner never acquired title to the syrup does not mean that it cannot be engaged as a wholesaler of the product. No such legal authority is cited to us. The same principle is involved when an automobile retailer gives an order to a customer on a manufacturer and an automobile is delivered to the

purchaser in Detroit or elsewhere by the manufacturer. If a bottler failed or refused to pay for a shipment of syrup, by no stretch of the imagination could it be seriously contended that The Coca-Cola Company could recover in an action against the bottler. Furthermore, under the contracts petitioner could insist on a stoppage of a shipment in transit and could hold The Coca-Cola Company liable if it refused to stop a shipment as directed by petitioner. Under the facts of this case, it cannot be said that petitioner's selling activity was the mere rendition of a marketing service or the exploitation of a license or a combination of both.

■ In the absence of an application to the commissioner by petitioner for permission to use a method of computing its tax other than the three-factor-ratio formula as required by Ga. L. 1950, p. 299 (Code, Ann. Supp., § 92-3113), petitioner was required to compute its tax by this formula regardless of the fact that it had no inventory in Georgia, and that therefore one of the factors was missing. Ga. L. 1950, pp. 299, 300 (Code, Ann. Supp., § 92-3113) provides that tax shall be imposed only on that portion of the business income which is reasonably attributable to the business done within this State. Where business is done within and without this State, subdivision 4 of the above law is mandatory as to the method by which the portion of the income attributable to business done within this state must be arrived at, and that method is the use of the *three-factor-ratio* formula (with exception referred to later which is not applicable in this case, see Code §§ 92-3114, 92-3115). Subsection 4 provides that such portion of income "*shall* be taken to be the portion arrived at by application of the" three-factor-ratio formula. (Emphasis supplied.) It is contended by the State and commissioner that the three-factor-ratio formula does not and cannot apply in this case for the reason that the taxpayer had no inventory and, therefore, one of the factors was lacking. In our opinion, the absence of one of the factors does not preclude the application of the three-factor-ratio formula. In the first place, the only provision for this formula to be disregarded is the one in the above law which authorizes the commissioner to use another and more equitable method of computing the tax upon application of the taxpayer. No such application was made in this case and no substitute method was approved. Therefore, under the plain and unambig-

uous command of the statute, the taxpayer and the commissioner were bound by and restricted to the three-factor-ratio formula regardless of how many factors were lacking. In the second place, the act of 1941 (Ga. L. 1941, p. 218) provided that, if a taxpayer's situation called for an application of a formula such as the three-factor-ratio formula, and one of the factors was lacking, a two-factor-ratio formula should be used in lieu of the three-factor-ratio formula. The act also provided for the use of a one-factor formula if two factors of the three factors were lacking. The act of 1950 (Ga. L. 1950, p. 299), which completely re-wrote the apportionment law, omitted the provisions for use of the two and one-factor formulas, and made no substitute provision as to how to compute the tax if any of the factors was lacking. (The contention of the State that Ga. L. 1950, pp. 299, 300 Code, Ann. Supp., § 92-3113 (5), makes such a provision is without support, because that section only covers cases where the income of the taxpayer is derived from business *other* than the manufacture, production, or sale of tangible personal property.) It is to be presumed that the General Assemly knew what it was doing, and that it did what it did for reasons satisfactory to it. It gave us a mandate that, under such facts as we have in this case, the three-factor-ratio formula must be used unless the commissioner authorizes otherwise on application of the taxpayer. The conclusion is inescapable that, if the General Assembly once provided for a two-factor ratio and a one-factor ratio formula, and by amendment completely did away with them, it was actuated by an unmistakable intention that they were to be used no more. The principle enunciated in *State Revenue Commission* v. *Edgar Bros. Co.*, 185 *Ga.* 216, 230 (194 S. E. 505), is not applicable for two reasons: (1) that case applied to a situation where the General Assembly had not prescribed a formula; and (2) because the formula prescribed by the General Assembly was used by the commissioner in assessing the taxes herein involved.

■ The other basis for the taxpayer's claim for refund is that the commissioner erred in including in the taxpayer's gross receipts within the State the sales to customers outside Georgia where deliveries were made outside of Georgia. Ga. L. 1950, pp. 299, 300 (Code, Ann. Supp., § 92-3113 (4) (c)) provides: "Gross Receipts Ratio. The ratio of gross receipts from business

done within this State to total gross receipts from business done everywhere. For the purposes of this section receipts shall be deemed to have been derived from business done within this State *only* if received from products *shipped to customers in this State,* or *delivered within this State to customers,* and in determining the gross receipts within Georgia, receipts from sales negotiated or effected through offices of the taxpayer outside the State and delivered from storage in the State to customers outside the State shall be excluded" (Emphasis supplied.) It is contended by the State that, properly construed, the foregoing provision means that, unless sales are made by the taxpayer through offices of the taxpayer outside of Georgia, the proceeds of the sales are to be classified as receipts attributable to business done in Georgia. We cannot agree to such a construction. The first provision says plainly what are to be considered Georgia receipts. The final clause of Code § 92-3113 (4) (c) does not purport to include any receipts in Georgia gross receipts. It is an excluding clause which simply excludes from Georgia receipts certain receipts which evidently it was thought would be otherwise included by the including clauses, a matter on which we express no opinion. It is not necessary for us to decide what receipts are excluded by the final clause, since we hold that the taxpayers' receipts from sales to customers outside Georgia were not included in Georgia gross receipts by the including clauses. The products sold to customers outside Georgia were neither "shipped to customers in this State" nor "delivered within this State to customers." Therefore it is immaterial that such sales were not "negotiated or effected through offices of the taxpayer outside the State," assuming that the exclusion clause excludes something which would otherwise be included. The various parties to the contracts had a right to provide with impunity that delivery of syrup ordered by a bottler would take place at the point where the bottler's plant was located. In case of out-of-State sales the deliveries were made without the State and not within the State on the theory that delivery to a common carrier was delivery to the out-of-State bottler in Georgia. In the absence of agreement, delivery to a carrier is delivery to the consignee. Where there is an agreement to the contrary, the title does not pass upon delivery to a carrier. *Colfax Gin Co.* v. *Buck-*

*eye Cotton Oil Co.*, 24 *Ga. App.* 610 (101 S. E. 697); *Falvey & Co.* v. *Richmond*, 87 *Ga.* 99 (13 S. E. 261); 46 Am. Jur. 607, § 440. *Parke, Davis & Co.* v. *Cook*, 198 *Ga.* 457 (31 S. E. 2d 728, 156 A. L. R. 1360), is not a holding to the contrary. If it could be said that petitioner could be precluded from making a perfectly legal contract with reference to when title passed simply because it did so to obtain a tax advantage, such a finding could not be made in this case, since the parties began to make such contracts long before the first Georgia income tax law was enacted.

■ We think Code (Ann.) § 92-3002 (n), which provided: "The word 'sale or sales' wherever appearing in Part IX of this Title for the purpose of apportioning net income to Georgia shall be deemed to be the total value of all sales made through or by the offices, agencies, or branches located within this State, regardless of the destination," was repealed by implication by the act of 1950, as it is repugnant to the General Assembly's intention to give effect to the destination of goods theory in income-tax matters. *Montag Bros.* v. *State Revenue Commissioner*, 50 *Ga. App.* 660 (179 S. E. 563), was decided before the act of 1950.

The court did not err in overruling the general demurrer to the petition and in finding in favor of the petitioner regardless of the reason given for its judgment.

*Judgments affirmed. Gardner, P. J., and Townsend, Carlisle and Nichols, JJ., concur. Quillian, J., dissents.*

QUILLIAN, J., dissenting. I entertain a different view from that expressed in the majority opinion as to whether the plaintiff in selling personal property within the State and elsewhere, was entitled to use the three-factor formula of Code (Ann. Supp.) § 92-3113 in calculating the proportion of the income realized from the sales taxable in this State.

Ordinarily a taxpayer engaged in the selling of some particular commodity or commodities calculates the amount of his taxable income realized from such sales by the simple process of subtracting from the gross returns of the sales the aggregate of the several items of expense incurred in carrying on the business.

Where a taxpayer is engaged in the business of selling tangible commodities within the State and elsewhere, incurring such operation expenses incident to both the conservation of both classes

of sales, it is difficult for the taxpayer to segregate the expense chargeable against the gross income derived from the sales to customers within the State from those chargeable against the gross returns of the sales made elsewhere.

The enactment of the three-factor formula of Code (Ann. Supp.) § 92-3113 was to obviate this difficulty by furnishing to the taxpayer so situated a convenient and reasonably accurate method of determining the proportion of his net income upon which this State might impose tax.

The formula, it will be remembered, provides that the gross income derived from sales made within the State and elsewhere be balanced against the two general items or factors of expense, namely the inventory held within the State and elsewhere, and the compensation paid for services in connection with the taxpayer's business to employees within the State and elsewhere.

Whatever process may be employed in determining any business enterprise's net income necessarily involves the comparison or balancing of gross profits earned against the expense incurred in earning the profits. In no other way is it possible to ascertain the net earning of any business institute upon which may be imposed income tax.

While the formula provides a way in which the ratio of the taxpayer's income derived from sales of personal property within the State or elsewhere is taxable by the State, this is not its only function.

The formula also supplies another method of procedure in balancing the gross returns from sales made within the State against the aggregate of the items of expense incident to and incurred in making the sales, so as to reflect the net income realized from the sales to customers within the State.

The "factors" referred to in the Code section to be considered in arriving at the ratio and amount of the taxpayer's income upon which this State may impose taxes are its gross earned income, and the two categories of expense normally incident to making such sales, those of keeping on hand a stock of goods, referred to by the statute as inventory, and the other general expenditures including salaries, wages, commissions, and compensation of employees.

In order to balance the factors of gross income against the factors of expense so as to obtain the result contemplated by the statute, it would as a matter of fact, be necessary that all of the factors of expense that the statute requires considered be included in the compilation.

The formula is, after all, just a means of solving a mathematical problem the equations of which are the gross profits and the items of expense. In the solution of any such problem all of the equations must be considered in arriving at the correct answer.

The formula provides that the sum total of the sales, and the two classes of expense, one the keeping of the inventory, the other expenses necessarily involved in profitably disposing of the inventory, be divided by three, because there are three factors making up that total.

I am constrained to hold that the plaintiff, which kept no inventory, was not entitled to use the formula in arriving at the ratio of its income derived from sales made to customers both within the State and elsewhere taxable by the State, and that the method employed by the plaintiff for that purpose was not permissible.

The statute does not authorize the use of the formula by balancing against the gross income a non-existent element or factor of expense. This is exactly the process by which the plaintiff proceeded when it added to the gross income from the sales and the salaries, wages, and other expenses incurred in conducting its business a zero, representing, as it contended, the inventory that it did not keep, and then divided the two existent factors by the divisor three.

The plaintiff contends that it was the duty of the commissioner, if the use of the formula was not the correct method of arriving at the ratio and amount of its income taxable by this State, to direct that some other method be employed, and that until he, the commissioner, did give permission to use such other method as he deemed appropriate for the purpose, it had the right to use the formula as was adaptable to its situation. The position is not tenable for the reason that Code (Ann. Supp.) § 92-3113 merely provides that, if a corporation shows that any other method of allocation than the processes or formula prescribed by the revenue laws reflects more clearly its income attributable to business done

within the State, it may apply to the commissioner to be allowed to use that method, but does not require the commissioner to direct that any method other than that provided by law be used unless and until such application is made.